[No. 10138–0–III. Division Three. May 31, 1990.]

WALTER BUSH, ET AL, *Respondents,* v. JOHN L. O'CONNOR, ET AL, *Petitioners.*

*Robert Crotty* and *Lukins & Annis,* for petitioners.

*Jerry Dyreson,* for respondents.

THOMPSON, J.—John L. O'Connor petitioned for discretionary review of a partial summary judgment holding him liable to Ethel and Walter Bush for legal malpractice. We accepted review. The Bushes alleged Mr. O'Connor negligently failed to file an action against State Farm, their · underinsured motorist (UIM) carrier, before the effective date of the tort reform act of 1986, Laws of 1986, ch. 305. We hold Mr. O'Connor correctly determined Washington law did not apply to the Bushes' action. We therefore reverse the partial summary judgment obtained by the Bushes, and direct entry of summary judgment in Mr. O'Connor's favor.

On March 5, 1986, Mr. and Mrs. Bush, Washington residents, were seriously injured in an automobile accident in Florida. The driver of their vehicle, a resident of Florida, was the negligent party. His insurance liability limits were $100,000 for each individual and $300,000 per accident.

This amount was inadequate to cover the Bushes' damages as well as the damages to other persons in their car and in the car with which they collided. The Bushes also had two policies with State Farm Insurance which provided UIM coverage—an automobile policy with $100,000/$300,000 limits and an umbrella policy with a limit of $1 million.

On March 12, 1986, through the Bushes' son, attorney John O'Connor undertook to represent the Bushes and continued to do so until October, when the Bushes hired another attorney. In March 1987, the Bushes settled with the driver's insurance company.

On May 11, 1987, State Farm informed the Bushes that their claim for UIM coverage was subject to the provisions of the 1986 tort reform act, since they had not filed suit prior to the act's effective date, August 1, 1986. The act placed a cap on noneconomic damages. *See* RCW 4.56-.250(2), subsequently held unconstitutional in *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 771 P.2d 711, 780 P.2d 260 (1989).[1] The cap varied according to the circumstances. In the Bushes' case, the cap was $120,605.55.

In July, State Farm paid Walter $40,608.55 and Ethel $20,608.55. These payments were without prejudice to their claims for additional coverage and brought their recovery up to the amount provided for by the tort reform act. The Bushes brought an action against State Farm for additional coverage. In April 1988, they settled that action for $125,000.

In September 1988, Walter and Ethel Bush filed actions[2] for legal malpractice against Mr. O'Connor, alleging:

---

[1] RCW 4.56.250(2) provides:

"In no action seeking damages for personal injury or death may a claimant recover a judgment for noneconomic damages exceeding an amount determined by multiplying 0.43 by the average annual wage and by the life expectancy of the person incurring noneconomic damages, as the life expectancy is determined by the life expectancy tables adopted by the insurance commissioner. . . . The limitation contained in this subsection applies to all claims for noneconomic damages made by a claimant who incurred bodily injury."

[2] The Bushes originally filed separate actions, which the Superior Court later consolidated.

The defendant negligently pursued the Plaintiff's claim, failed to make a reasonable and diligent inquiry concerning insurance coverages and failed to file an action prior to the effective date of the 1986 tort reform act. As a proximate cause of such negligence on the part of Defendant . . ., Plaintiff's under–insured motorist carrier took the position that coverage for non–economic damages under the under–insured motorist policies issued to Plaintiff was limited by the 1986 tort reform act.

They moved for partial summary judgment on the issue of liability.

In his affidavit, Mr. O'Connor states he was aware of the tort reform act and had filed at least three other actions prior to the August 1, 1986, effective date of the act. He did not file the Bushes' claim because he determined that the act did not affect it. In his analysis, the act affected only tort actions, not contract claims such as the Bushes' claim against their insurer for UIM coverage. In his legal opinion, any attempt by State Farm to apply the act to the existing insurance contract would be an unconstitutional impairment of contract. He also believed that the act was unconstitutional as applied to tort cases and that, in any event, the Bushes' recovery would be governed by Florida law. The parties agree that in Florida there was no cap on non-economic damages in actions *accruing* prior to July 1, 1986. Fla. Stat. § 768.71(2) (Supp. 1990).

In response, the Bushes filed an affidavit from an attorney who has limited his practice to personal injury law since 1977. The attorney asserts that Mr. O'Connor was negligent:

Recognizing the substantial medical expenses incurred by his clients; the nature of the injuries sustained by his clients; the liability limits of [the negligent driver's] insurance and the fact that the Bushes had additional insurance coverages, attorney O'Connor should have been aware of the possibility of substantial under–insured motorist claims on the part of Ethel and Walter Bush.

Despite this knowledge, attorney O'Connor neither discussed the Washington State Tort Reform Act with the Bushes and the possible effects of the cap on non–economic damages imposed by the act with the Bushes or contacted the Bushes' insurance carriers to determine what their position would be with regard to the effect of the Washington State Tort Reform

Act on the insurance coverage provided to Walter and Ethel Bush.

. . . .

. . . . If the insurance companies had informed him that they believed the tort reform act would apply if the claims were not filed, he could have done so to protect his clients. . . .

. . . .

There is no question that the ability of [the insurers] to assert the tort reform act was of substantial benefit to them in negotiating a settlement with Walter and Ethel Bush. It is equally clear that Ethel and Walter Bush were required to accept the final settlement which was negotiated on their behalf or face the possibility at trial that the statute would be found to limit their non–economic damages, thus losing the $125,000.00 . . . settlement.

In their affidavits, the Bushes confirm that Mr. O'Connor did not discuss the tort reform act with them. They attest that they would have insisted Mr. O'Connor file their action before the effective date of the tort reform act, had he advised them of the risk.

The court granted the Bushes' motion for partial summary judgment on the issue of liability. Mr. O'Connor moved to reconsider and at the same time filed his own motion for summary judgment. The court denied both motions.

■ Liability for legal malpractice requires proof of four elements:

(a) the existence of an attorney–client relationship; (b) the existence of a duty on the part of the lawyer; (c) failure to perform the duty; and (d) the negligence of the lawyer must have been a proximate cause of the damage to the client.

*Martin v. Northwest Wash. Legal Servs.,* 43 Wn. App. 405, 408, 717 P.2d 779 (1986) (quoting *Sherry v. Diercks,* 29 Wn. App. 433, 437, 628 P.2d 1336, *review denied,* 96 Wn.2d 1003 (1981)). *See also Stangland v. Brock,* 109 Wn.2d 675, 679, 747 P.2d 464 (1987). With respect to (b) and (c) above,

[a]n attorney has a duty to exercise "that degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable, careful and prudent lawyer in the practice of law in this jurisdiction." *Cook, Flanagan & Berst v. Clausing,* 73 Wn.2d 393, 395, 438 P.2d 865 (1968).

*Halvorsen v. Ferguson,* 46 Wn. App. 708, 712, 735 P.2d 675 (1986), *review denied,* 108 Wn.2d 1008 (1987). *See also Stangland,* at 682.

Mr. O'Connor first contends that he breached no duty to the Bushes because he accurately predicted the Supreme Court's holding that the cap on noneconomic damages violates the state constitutional right to trial by jury. *Sofie.* The Bushes counter that Mr. O'Connor's decision not to file before the effective date of the tort reform act must be judged at the time it was made rather than at the time of trial. We need not resolve this dispute because we hold that Mr. O'Connor's decision not to file was correct on an alternate basis. Specifically, Florida law, not Washington law, applied to the Bushes' UIM claim.

█ Both Washington and Forida have rejected the lex loci delicti choice–of–law rule (the law of the place of injury controls) in favor of the significant relationships test set forth in the Restatement (Second) of Conflict of Laws §§ 145–146 (1971). *Johnson v. Spider Staging Corp.,* 87 Wn.2d 577, 580, 555 P.2d 997 (1976); *State Farm Mut. Auto. Ins. Co. v. Olsen,* 406 So. 2d 1109, 1110 (Fla. 1981). The following general principles apply with respect to tort choice–of–law problems:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145. In personal injury actions,

> the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 146.

Both sections 145 and 146 refer to the "principles stated in § 6". Those principles include:

> (2) . . . .
> . . . .
> (b) the relevant polices of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

Restatement (Second) of Conflict of Laws § 6, at 10. Section 146, comment *c*, at 430, notes:

> In large part, the answer to [the choice–of–law] question will depend upon whether some other state has a greater interest in the determination of the particular issue than the state where the injury occurred. *The extent of the interest of each of the potentially interested states should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and of the particular issue [involved].*

(Italics ours.)

In *Johnson,* a Kansas resident sued a Washington corporation for the wrongful death of her husband who died when he fell from a scaffold manufactured by the Washington corporation. The accident occurred in Kansas. Kansas law limited damages in wrongful death actions to $50,000; Washington law placed no limit on such damages. The court found that the significant contacts of each state were evenly balanced. *Johnson,* at 581–82. The court then went on to evaluate the purposes of the local laws and whether they were achieved by application to the facts at issue.

Kansas limits wrongful death damages in order to protect defendants from excessive financial burdens, and to eliminate speculative claims and difficult computation issues.

*Johnson,* at 582. This purpose is primarily local, *i.e.,* it protects the residents of the state in question. *Johnson,* at 582–83. It is not served when the defendant is a nonresident such as the corporate defendant in *Johnson.*

A state's interest in allowing full recovery in a wrongful death action is to deter the kind of conduct within its borders which wrongfully takes life. The deterrent policy of full compensation "is clearly advanced by the application of [Washington] law." *Johnson,* at 583. Thus, *Johnson* held that Washington's law applied. *Johnson,* at 584.

In *Olsen,* the action arose from an automobile accident occurring in Illinois in which a Florida resident was killed. The deceased's wife sought arbitration of her claim against their uninsured motorist carrier and asked that the arbitration be governed by the substantive law of Florida. Illinois' law of contributory negligence would bar her action; Florida's law of comparative negligence would not. The court cited the above Restatement sections, and concluded Illinois was the state with the most contacts. It held Illinois had an interest in the rights of its citizens who were subject to a subrogation claim by the insurer on any uninsured motorist coverage it paid. *Olsen,* 406 So. 2d at 1111.

█ Under tort choice–of–law principles, as set forth in the Restatement, Florida had the most significant contacts with the Bushes' claim. Both the negligence and injury occurred in Florida, the domicile of the tortfeasor. Washington's only contact with the claim is that the Bushes resided here. The purpose of the Washington law in question, *i.e.,* the cap on noneconomic damages, was to protect Washington residents from excessive and speculative damage awards and thereby lower the cost of liability insurance to Washington residents. Those purposes are not served by applying Washington law to the Bushes' claim against their tortfeasor, since he was a Forida resident, not a Washington resident.

*Andres v. Continental Ins. Co.,* 444 So. 2d 479 (Fla. Dist. Ct. App. 1984) is distinguishable. There, the accident occurred in Forida. The negligent tortfeasor was a Florida

resident. The injured plaintiff was a resident of Maine. The plaintiff's UIM carrier wanted to apply Florida's collateral source law, thus enabling it to deduct some $60,000 in medical payments made to the plaintiff by Medicare and by his own health insurance. The court declined to do so, holding that Florida had no significant interest to protect because its resident, the negligent tortfeasor, had already settled with the Maine plaintiff. On the other hand, Maine's interest, *i.e.*, assuring maximum recovery to its resident, continued.

Like the plaintiff in *Andrews,* the Bushes have settled with their Florida tortfeasor. But the similarity with *Andrews* ends there. In *Andrews,* the purpose of Florida's collateral source statute was to prevent a double recovery by an injured person. Florida's interest in applying this law ended once the Florida resident was dismissed from the case. Here, the pertinent law is a Washington statute which was enacted to benefit Washington residents by protecting them against excessive judgments and holding down insurance premiums. We have held that these purposes are not furthered by application of the Washington law. Settlement with the tortfeasor does not change our conclusion. Whether or not the Bushes settled, no Washington resident runs the risk of an excessive judgment. Furthermore,

> the effect on claims of the choice of law rules is almost certainly so speculative as to be a negligible factor in the actuarial determinations of the premiums that are charged by insurers for uninsured motorist insurance.

1 A. Widiss, *Uninsured and Underinsured Motorist Insurance* § 7.15, at 312 (2d ed. 1990).

The Bushes argue that tort choice–of–law principles do not apply to their claim against their UIM carrier. We agree that the law of the state in which the contract was formed governs issues of contract interpretation. *Dairyland Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 41 Wn. App. 26, 31, 701 P.2d 806 (issue concerned interpretation of household exclusion clause), *review denied,* 104 Wn.2d 1016 (1985); *Aetna Cas. & Sur. Co. v. Diamond,* 472 So. 2d 1312

(Fla. Dist. Ct. App. 1985) (other insurance clause); *Lewis v. American Family Ins. Group,* 555 S.W.2d 579 (Ky. 1977) (exclusionary clauses). But here, the issue is not contract interpretation; rather, it concerns the tort liability of the negligent driver.

██ Under RCW 48.22.030(2), automobile liability policies for motor vehicles registered or principally garaged in this state must include coverage "for the protection of persons insured thereunder *who are legally entitled to recover damages from owners or operators of underinsured motor vehicles . . .* because of bodily injury, death, or property damage, resulting therefrom . . .". (Italics ours.) Our courts consistently have held that the insurer stands in the shoes of the underinsured motorist and provides its insureds with the coverage the underinsured motorist's insurance would have provided, if he had such insurance. *Sayan v. United Servs. Auto. Ass'n,* 43 Wn. App. 148, 157, 716 P.2d 895 (citing *Grange Ins. Ass'n v. Hubbard,* 35 Wn. App. 407, 413, 667 P.2d 121, *review denied,* 100 Wn.2d 1023 (1983); *Brummett v. Grange Ins. Ass'n,* 4 Wn. App. 979, 984, 485 P.2d 88 (1971)), *review denied,* 106 Wn.2d 1009 (1986). Since the basis of the Bushes' claim for UIM coverage is their rights against the underinsured tortfeasor, tort choice–of–law principles apply.

Finally, the Bushes contend that even if Mr. O'Connor was correct in concluding that Forida law applied, he is still liable for malpractice. They base their claim on the alleged existence of a duty to advise them (1) of the possibility that State Farm might assert the tort reform act as a defense, and (2) that they could foreclose any such reliance by simply filing their action before the act's effective date. They rely upon the Rules of Professional Conduct which state that the lawyer shall act with diligence and keep the client reasonably informed, and explain matters to the extent necessary to permit the client to make informed decisions. RPC 1.3, 1.4.

 The Rules of Professional Conduct do not enlarge upon the common law duties of competence and fiduciary

obligation. *See, e.g., Greening v. Klamen,* 652 S.W.2d 730, 734 (Mo. Ct. App. 1983). Under common law, an attorney unquestionably has a duty to investigate the applicable law and disclose the results to his clients, *Burien Motors, Inc. v. Balch,* 9 Wn. App. 573, 577, 513 P.2d 582 (1973), *review denied,* 83 Wn.2d 1005 (1974), but the Bushes have cited no authority for the proposition that the attorney has a duty to investigate and disclose *inapplicable* law. Simply because the insurer here relied upon inapplicable law in its defense of the Bushes' claim does not mean that Mr. O'Connor committed malpractice in failing to anticipate that reliance.[3] As stated in 1 R. Mallen & J. Smith, *Legal Malpractice* § 14.6, at 822 (3d ed. 1989): "Lawyers should not be penalized for either following an erroneous view which the ordinary lawyer perceives to be correct *or for urging the correct view which the ordinary lawyer considers to be erroneous.*" (Italics ours.) We refuse to hold that a lawyer has a duty to anticipate and avoid a nonmeritorious defense.

Accordingly, we hold as a matter of law that Mr. O'Connor did not breach his duty of care to the Bushes. The partial summary judgment of liability is reversed and the cause remanded with directions to the trial court to enter summary judgment in favor of Mr. O'Connor.

MUNSON, C.J., and GREEN, J., concur.

Review denied at 115 Wn.2d 1020 (1990).

---

[3] By the same token, this opinion should not be construed as a negative comment on legal advice given by the Bushes' current counsel in negotiating a settlement with the insurance carrier. Counsel had to deal with a myriad of uncertainties. An attorney has to make many judgment calls during the course of representing a client in a complex case. The law does not require perfect judgment, nor the ability to divine what an appellate court will do in a case of first impression. Decisions made in good faith after fully investigating the law and facts are not actionable as malpractice absent negligence. *Cook, Flanagan & Berst v. Clausing,* 73 Wn.2d 393, 394, 438 P.2d 865 (1968); *Halvorsen v. Ferguson,* 46 Wn. App. 708, 717, 735 P.2d 675 (1986).